# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

ERIK MISHIYEV,

Plaintiff,                                          Case No.: <u>8:23-cv-1942-MSS-UAM</u>

v.

UMG RECORDINGS, INC.;

SONY MUSIC ENTERTAINMENT;

THE ORCHARD MUSIC;                                  **OCT 26 2023 PM 2:27**
                                                    FILED - USDC - FLMD - TPA
YT ROCKET;

INGROVEES;

ODMEDIA NETWORK; and

VIOLENT MUSIC BV,

Defendants.

_____/

## INTRODUCTION

COMES NOW, the Plaintiff, ERIK MISHIYEV (the "Plaintiff" or "Mr. Mishiyev") and sues the Defendants, UMG RECORDINGS, INC, SONY MUSIC ENTERTAINMENT, THE ORCHARD MUSIC, YT ROCKET, INGROVEES, ODMEDIA NETWORK, VIOLENT MUSIC BV, jointly and severally, for damages and other relief and as grounds therefore, aver as follows:

## AMENDED COMPLAINT[1] AND JURY TRIAL DEMANDED

COMES NOW, the Plaintiff, ERIK MISHIYEV (the "Plaintiff" or "Mr. Mishiyev") and says as follows:

## PARTIES

1.  Plaintiff, **ERIK MISHIYEV** (the "Plaintiff" or "Mr. Mishiyev") is an individual and is a resident of the State of Florida, in Hillsborough County

---

[1] This is being filed pursuant to the Court's Order allowing an Amended Complaint to be filed.

2. Defendant, **UMG RECORDINGS, INC.** ("Universal") is an American global music corporation organized under Delaware law, with its principal place of business and global corporate headquarters located in Santa Monica, California. It is also known as and does business interchangeably as "UMG" and "Universal Music Group." UMG also maintains U.S. headquarters at 1755 Broadway, New York, New York. On information and belief, UMG Recordings, Inc. is the entity responsible for the conduct described herein and is the proper Defendant in this action. If discovery demonstrates Case 1:23-cv-00015 Document 1 Filed 01/04/23 Page 4 of 21 5 that there are other UMG entities that are also responsible and/or liable for the conduct challenged in this litigation, Plaintiffs will amend their complaint and name those additional entities as defendants in this action. 13. Universal uses the trade names "UMG" and "Universal Music Group" for its various corporate music-based operations. It is also the successor-in-interest to several other companies and/or brands within the Universal Music Group, including Polygram, Chrysalis, A & M, Capitol, EMI, Motown, Def Jam, Geffen, and the other companies which UMG/Universal Music Group succeeded by merger, acquisition, business combination, restructuring, or operation of law.

3. Defendant, **SONY MUSIC ENTERTAINMENT** ("SME") is a Delaware general partnership, the partners of which are citizens of New York and Delaware.  SME's headquarters and principal place of business are located at 25 Madison Avenue, New York, New York, and it has substantial business operations in the state of Florida.

4. Defendant, **THE ORCHARD MUSIC** ("The Orchard") is a New York corporation and has a principal place of business as New York, New York and is a subsidiary of Sony Music and specializes in media distribution

5. Defendant, **YT ROCKET** ("YT") is a Colorado corporation and has a principal place of business as Medellin, Colorado and specializes in promotion and distribution of musical artists.

6. Defendant, **INGROVEES** ("Ingrovees") is a California corporation and has a principal place of business as San Francisco, California and as of 2008, Universal Music Group has utilized Ingrovees' parent company, to digitally distribute all of its music in North America. Ingrovees distributes music for artists and independent record labels.

7. Defendant, **ODMEDIA NETWORK** ("Odmedia") is a privately held company and has a principal place of business in the Netherlands and provides services such as media processing, playout services, aggregation services, content promotion and monetization and more, thereby helping in connecting content owners and platforms to deliver content to viewers on any screen around the world and offering services that cover the entire video content lifecycle from the creation of a digital cinema package to the technical delivery to OTT platforms and broadcasters.

8. Defendant, **VIOLENT MUSIC BV** ("Violent Music") is a is a privately held company and has a principal place of business in the Netherlands and distributes music for artists and independent record labels.

9. Collectively all Defendants will be referred to as the "Defendants".

## SUBJECT MATTER JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C § 1331 as federal questions are presented.

11. Plaintiffs' claims arise under the Copyright Act (17 U.S.C. §§ 101 et seq.), and this Court has jurisdiction over those claims pursuant to 28 U.S.C. §§ 1331 and 1338.

12. Venue is properly found in this District pursuant to 28 U.S.C. §1391(b), in that all parties reside, and plaintiffs' claims arose, within the District.

13. The Court has supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. §1367(a).

## COUNT I – ALL DEFENDANTS
## (MISREPRESENTATION UNDER 17 U.S.C. § 512(F))

14. Plaintiff sets forth the following facts in support of this cause of action.

15. This action arises out of a series of fraudulent Digital Millennium Copyright Act ("DMCA") takedown notices provided to You Tube by the Defendants.

16. As discussed herein, the Defendants were able to do this because of a hole in YouTubes's DMCA process security, which allows any person to claim to be representing any rights holder in the world for purposes of issuing a DMCA takedown.

17. As far as You Tube is concerned, any person, anywhere in the world, can issue a takedown notice on behalf of any rights holder, anywhere.  This could be done by a competitive content producer.

18. The Plaintiff was one of the most highly successful music DJ's in the hip-hop industry and operated a YouTube channel that as of 2018 had over 250,00 subscribers and 110 million lifetime views.  The Plaintiff was known as "DJ Short-E". YouTube is a video-sharing site where close to a billion internet users post videos.  Plaintiff spent 10 years building up his YouTube channel. Users can monetize their channels, while making a good living from Google's AdSense program which places advertisements on users videos and channels. The more views the more money you make.

19. YouTube channels operate much like television channels, with each individual channel, being able to develop its own content, interact with users and seek out and gain subscribers, who are then notified each time that channel creates new videos.

20. The Plaintiff was one of the early users of YouTube, having created several YouTube channels, as early as 2007.

21. In 2007, YouTube was still a very new platform.  It has since that time become

extremely popular.

22.       The number of subscribers that a YouTube channel has is a highly sought after goal and in the early part of 2017 the Plaintiff received a congratulatory letter from the then CEO of YouTube, commemorating his channel reaching 100,000 subscribers and stating, "No one can take this away from you".

23.       Tens of thousands of YouTubers posted  and continue to post content similar to the Plaintiff and it was only after the content that was posted appeared to be of a politically conservative nature, that the Plaintiff was censored, shadow banned and bombarded with copyright infringement complaints, views to his page were diverted and his channel was ultimately terminated.  For no reason, on or about December 14, 2018 YouTube notified Plaintiff that they were permanently canceling his YouTube channels because of his litigation threat with respect to the issues he has been having with his channels. This left the Plaintiff, a self-employed, life-long Democrat, with no livelihood.

24. At the time that the Plaintiff's YouTube channel was canceled, he had accumulated over 100 million views and earned over $310,000 from YouTube. Due to the actions of the Defendant/Appellee, the Plaintiff lost his income, his reputation was defamed, his credit score was ruined and he was placed on the verge of bankruptcy.  Adding insult to injury, YouTube now allows other YouTubers to go by the name "DJ Short-E", even though the Plaintiff has a federal trademark for the name "DJ Short-E", with U.S. Serial Number: 85930668, U.S. Registration Number: 4493986, U.S. Registration Date: Mar 11, 2014, Mark: DJ SHORTE, Owner: Mishiyev, Erik--

25. Plaintiff has never been sued for copyright and never lost a copyright dispute. YouTube did not follow their own terms and conditions and copyright policies and for the first time ever didn't send Plaintiff's counter notifications to claimants so he could defend himself against these frivolous claims, this all started happening the day after they notified Plaintiff that they were taking down his channels, which seemed to be a retaliation of some sort to his litigation threat. It is known that people put frivolous copyright claims on popular videos to try and steal ad earnings and to stifle competition and to stop any momentum the video has by taking it down which causes a Youtuber to get a strike on their channel. After three strikes the channel gets taken down. YouTube allows users to file a dispute and if no court action is taken the videos must go back online and the strike should then be removed. Plaintiff argues that any copyright issues that arose were covered by the Fair Use doctrine.

26. Plaintiff noticed illegal activity by YouTube when his subscribers contacted him to tell him what was happening to them.

27. After years of trying to get problems with his channels fixed, Plaintiff threatened YouTube with a lawsuit after their google chat reps were hiding some crucial information from him such as proof of if they were actually sending his new video uploads to his subscribers who wanted to be notified.  YouTube said "We can't share this information with you."

28. Constant contact and GoDaddy email marketing and countless other companies show full

transparency on distribution on the back end, but YouTube does not!

29. In censoring (flagging, demonetizing, etc.) Plaintiff, Defendants relied upon and acted pursuant to Section 230 of the Communications Decency Act.

30. Defendants would not have deplatformed Plaintiff or similarly situated Putative Class Members but for the immunity purportedly offered by Section 230.

31. . Section 230(c)(2) purports to immunize social media companies from liability for action taken by them to block, restrict, or refuse to carry "objectionable" speech even if that speech is "constitutionally protected." 47 U.S.C. § 230(c)(2).

32. In addition, Section 230(c)(1) also has been interpreted as furnishing an additional immunity to social media companies for action taken by them to block, restrict, or refuse to carry constitutionally protected speech.

33. Section 230(c)(1) and 230(c)(2) were deliberately enacted by Congress to induce, encourage, and promote social medial companies to accomplish an objective—the censorship of supposedly "objectionable" but constitutionally protected speech on the Internet—that Congress could not constitutionally accomplish itself.

34. Congress cannot lawfully induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 US 455, 465 (1973).

35. Section 230(c)(2) is therefore unconstitutional on its face, and Section 230(c)(1) is likewise unconstitutional insofar as it has been interpreted to immunize social media companies for action they take to censor constitutionally protected speech.

36. Section 230(c)(2) on its face, as well as Section 230(c)(1) when interpreted as described above, are also subject to heightened First Amendment scrutiny as content- and viewpoint-based regulations authorizing and encouraging large social media companies to censor constitutionally protected speech on the basis of its supposedly objectionable content and viewpoint. *See Denver Area Educational Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727 (1996).

37. Such heightened scrutiny cannot be satisfied here because Section 230 is not narrowly tailored, but rather a blank check issued to private companies holding unprecedented power over the content of public discourse to censor constitutionally protected speech with impunity, resulting in a grave threat to the freedom of expression and to democracy itself; because the word "objectionable" in Section 230 is so ill-defined, vague and capacious that it results in systematic viewpoint-based censorship of political speech, rather than merely the protection of children from obscene or sexually explicit speech as was its original intent; because Section 230 purports to immunize social media companies for censoring speech on the basis of viewpoint, not merely content; because Section 230 has turned a handful of private behemoth companies into "ministries of truth" and into the arbiters of what information and viewpoints can and cannot be uttered or heard by hundreds of millions of Americans; and because the legitimate interests behind Section 230 could have been served through far less speech-restrictive measures.

38. Universal is the largest record label in the world. In Universal's standardized recording contract, artists assign the copyright in their sound recordings to Universal in exchange for royalty payments. Universal then markets and distributes these recordings and is contractually required to account to its artists for royalties owed. Universal also monitors the internet for content posted from their artist which they believe violates copyright laws.

39. Universal has routinely made what are called strikes against the Plaintiff's Youtube channel for the same type of content that other Youtube creators routinely post.

40. SME is one of the world's largest music entertainment companies. Both directly and through its affiliated companies and record labels SME produces, manufactures, distributes, markets, sells and licenses some of the most iconic and popular sound records of all al time, as well as many of today's biggest hits. SME also monitors the internet for content posted from their artists which they believe violates copyright laws.

41. SME has routinely made what are called strikes against the Plaintiff's Youtube channel for the same type of content that other YouTube creators routinely post.

42. THE ORCHARD MUSIC, YT ROCKET, INGROVEES, ODMEDIA NETWORK and VIOLENT MUSIC BV have routinely made what are called strikes against the Plaintiff's YouTube channel for the same type of content that other YouTube creators routinely post.

43. These strikes are based on allegations that the content that the Plaintiff has posted somehow violates copyright laws.

44. These strikes are false and in reality nothing that was posted on the Plaintiff's Youtube channel falls outside of the "Fair Use" doctrine of the copyright laws.

45. The strikes are sent under the Digital Millennium Copyright Act as what is called a DMCA takedown and these DMCA takedowns are sent and an individual such as the Plaintiff is not able to effectively defend against these and ultimately can face action, such as his Youtube channel being removed.

46. Under the DMCA takedown policy, copyright owners may file a notice with participating service providers to have allegedly infringing materials removed from a service provider's website. In exchange, the service provider is immune from the liability of its users' potentially infringing actions. The notice must include specific information, including a statement made under penalty of perjury that the copyright owner is not filing a fraudulent take-down notice. The penalties for misrepresentation can include actual damages and attorney's fees.

47. Specifically, 17 U.S. Code § 512 (f) ("Section 512 (f)") of the DMCA states that
Any person who knowingly materially misrepresents under this section—
(1)that material or activity is infringing, or

(2)that material or activity was removed or disabled by mistake or misidentification, shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or

activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

48. Collectively, the Defendants have violated Section 512 (f) by repeatedly filing false DMCA takedown notices against the Plaintiff.

49. The manner in which a Plaintiff can prove damages under the DMCA is set forth below:

The Digital Millennium Copyright Act ("DMCA") provides that a service provider, such as Google, may avoid liability for storing infringing content if the service provider expeditiously removes or disables access to the content after receiving a takedown notice from the copyright holder. 17 U.S.C. § 512(c)(1)(C); Lenz v. Universal Music Corp., 815 F.3d 1145, 1151 (9th Cir. 2016). The copyright holder must have "a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law." 17 U.S.C. § 512(c)(3)(A)(v).

Relevant to this action, the DMCA provides that a copyright holder may be subject to liability for misuse of the takedown procedure. In particular, "[a]ny person who knowingly materially misrepresents under this section . . . that material or activity is infringing . . . shall be liable for any damages." 17 U.S.C. § 512(f). The damages are recoverable when they are "incurred by the alleged infringer . . . who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing[.]" Id.

In this case, even assuming that the Complaint plausibly alleges a knowing and material misrepresentation, the Complaint does not allege that the service provider — which is not identified in the Complaint — "remov[ed] or disabl[ed] access" to the allegedly infringing material. 17 U.S.C. § 512(f). Absent some indication that a "takedown" actually occurred, Plaintiffs fail to allege the requisite injury under Section 512(f), and thus fail to state a plausible claim under the DMCA. *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 704-05 (D. Md. 2011); *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, 790 F. Supp. 2d 1024, 1028-29 (N.D. Cal. 2011); *cf. Lenz*, 815 F.3d at 1149-50, 1156 (where a takedown occurred, holding that the alleged infringer could recover nominal damages). *Opinion Corp. v. Roca Labs, Inc.*, Case No. 8:15-CV-811-17AEP (M.D. Fla. 2016)

50. Attached as **Composite Exhibit "A"** are documents showing communications from YouTube to the Plaintiff, including copyright disputes and other documents showing the arbitrary manner in which YouTube proceeded to terminate the Plaintiff's account.

51. The takedown notices in this matter were presented by the Defendants as being based on materials on the Plaintiff's YouTube channel that infringed upon copyright owned by the Defendants and/or for artists that were represented by the Defendants.

52. The takedown notices contained misrepresentations that material or activity was infringing.

7

53. On information and belief, Defendants knew at the time they sent the takedown notices that the representations in the takedown notices that material or activity was infringing were false.

54. The misrepresentations contained in the takedown notices were material to YouTube's decision to remove, or disable Plaintiff's channel.

55. Plaintiff suffered damages as a result of YouTube's relying upon such

56. misrepresentation in removing or disabling access to the material or activity claimed to be infringing.

**WHEREFORE,** Plaintiff, Mr. Mishiyev demands judgment against the Defendants for compensatory damages and for costs and attorneys' fees pursuant to 17 U.S.C. § 512(f), an award of reasonable attorneys' fees and costs and further relief as the Court may deem just and proper.

## COUNT II – ALL DEFENDANTS

## (INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS)

57. Plaintiff sets forth the following facts in support of this cause of action.

58. This action arises out of a series of fraudulent Digital Millennium Copyright Act ("DMCA") takedown notices provided to You Tube by the Defendants.

59. As discussed herein, the Defendants were able to do this because of a hole in YouTubes's DMCA process security, which allows any person to claim to be representing any rights holder in the world for purposes of issuing a DMCA takedown.

60. As far as You Tube is concerned, any person, anywhere in the world, can issue a takedown notice on behalf of any rights holder, anywhere.  This could be done by a competitive content producer.

61. The Plaintiff was one of the most highly successful music DJ's in the hip-hop industry and operated a YouTube channel that as of 2018 had over 250,00 subscribers.  The Plaintiff was known as "DJ Short-E". YouTube is a video-sharing site where close to a billion internet users post videos.  Plaintiff spent 10 years building up his YouTube channel. Users can monetize their channels, while making a good living from Google's AdSense program which places advertisements on users videos and channels. The more views the more money you make.

62.       YouTube channels operate much like television channels, with each individual channel, being able to develop its own content, interact with users and seek out and gain subscribers, who are then notified each time that channel creates new videos.

63.       The Plaintiff was one of the early users of YouTube, having created several YouTube channels, as early as 2007.

8

64.     In 2007, YouTube was still a very new platform.  It has since that time become extremely popular.

65.     The number of subscribers that a YouTube channel has is a highly sought after goal and in the early part of 2017 the Plaintiff received a congratulatory letter from the then CEO of YouTube, commemorating his channel reaching 100,000 subscribers and stating, "No one can take this away from you".

66.     Tens of thousands of YouTubers posted and continue to post content similar to the Plaintiff and it was only after the content that was posted appeared to be of a politically conservative nature, that the Plaintiff was censored, shadow banned and bombarded with copyright infringement complaints, views to his page were diverted and his channel was ultimately terminated.  For no reason, on or about December 14, 2018 YouTube notified Plaintiff that they were permanently canceling his YouTube channels because of his litigation threat with respect to the issues he has been having with his channels. This left the Plaintiff, a self-employed, life-long Democrat, with no livelihood.

67. At the time that the Plaintiff's YouTube channel was canceled, he had accumulated over 100 million views and earned over $310,000 from YouTube. Due to the actions of the Defendant/Appellee, the Plaintiff lost his income, his reputation was defamed, his credit score was ruined and he was placed on the verge of bankruptcy.  Adding insult to injury, YouTube now allows other YouTubers to go by the name "DJ Short-E", even though the Plaintiff has a federal trademark for the name "DJ Short-E", with U.S. Serial Number: 85930668, U.S. Registration Number: 4493986, U.S. Registration Date: Mar 11, 2014, Mark: DJ SHORTE, Owner: Mishiyev, Erik--

68. Plaintiff has never been sued for copyright and never lost a copyright dispute. YouTube did not follow their own terms and conditions and copyright policies and for the first time ever didn't send Plaintiff's counter notifications to claimants so he could defend himself against these frivolous claims, this all started happening the day after they notified Plaintiff that they were taking down his channels, which seemed to be a retaliation of some sort to his litigation threat. It is known that people put frivolous copyright claims on popular videos to try and steal ad earnings and to stifle competition and to stop any momentum the video has by taking it down which causes a Youtuber to get a strike on their channel. After three strikes the channel gets taken down. YouTube allows users to file a dispute and if no court action is taken the videos must go back online and the strike should then be removed. Plaintiff argues that any copyright issues that arose were covered by the Fair Use doctrine.

69. Plaintiff noticed illegal activity by YouTube when his subscribers contacted him to tell him what was happening to them.

70. After years of trying to get problems with his channels fixed, Plaintiff threatened YouTube with a lawsuit after their google chat reps were hiding some crucial information from him such as proof of if they were actually sending his new video uploads to his subscribers who wanted to be notified.  YouTube said, "We can't share this information with you."

71. Constant contact and GoDaddy email marketing and countless other companies show full transparency on distribution on the back end, but YouTube does not!

72. In censoring (flagging, demonetizing, etc.) Plaintiff, Defendants relied upon and acted pursuant to Section 230 of the Communications Decency Act.

73. Defendants would not have deplatformed Plaintiff or similarly situated Putative Class Members but for the immunity purportedly offered by Section 230.

74. . Section 230(c)(2) purports to immunize social media companies from liability for action taken by them to block, restrict, or refuse to carry "objectionable" speech even if that speech is "constitutionally protected." 47 U.S.C. § 230(c)(2).

75. In addition, Section 230(c)(1) also has been interpreted as furnishing an additional immunity to social media companies for action taken by them to block, restrict, or refuse to carry constitutionally protected speech.

76. Section 230(c)(1) and 230(c)(2) were deliberately enacted by Congress to induce, encourage, and promote social medial companies to accomplish an objective—the censorship of supposedly "objectionable" but constitutionally protected speech on the Internet—that Congress could not constitutionally accomplish itself.

77. Congress cannot lawfully induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 US 455, 465 (1973).

78. Section 230(c)(2) is therefore unconstitutional on its face, and Section 230(c)(1) is likewise unconstitutional insofar as it has been interpreted to immunize social media companies for action they take to censor constitutionally protected speech.

79. Section 230(c)(2) on its face, as well as Section 230(c)(1) when interpreted as described above, are also subject to heightened First Amendment scrutiny as content- and viewpoint-based regulations authorizing and encouraging large social media companies to censor constitutionally protected speech on the basis of its supposedly objectionable content and viewpoint. *See Denver Area Educational Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727 (1996).

80. Such heightened scrutiny cannot be satisfied here because Section 230 is not narrowly tailored, but rather a blank check issued to private companies holding unprecedented power over the content of public discourse to censor constitutionally protected speech with impunity, resulting in a grave threat to the freedom of expression and to democracy itself; because the word "objectionable" in Section 230 is so ill-defined, vague and capacious that it results in systematic viewpoint-based censorship of political speech, rather than merely the protection of children from obscene or sexually explicit speech as was its original intent; because Section 230 purports to immunize social media companies for censoring speech on the basis of viewpoint, not merely content; because Section 230 has turned a handful of private behemoth companies into "ministries of truth" and into the arbiters of what information and viewpoints can and cannot be uttered or heard by hundreds of

millions of Americans; and because the legitimate interests behind Section 230 could have been served through far less speech-restrictive measures.

81. Universal is the largest record label in the world. In Universal's standardized recording contract, artists assign the copyright in their sound recordings to Universal in exchange for royalty payments. Universal then markets and distributes these recordings and is contractually required to account to its artists for royalties owed. Universal also monitors the internet for content posted from their artist which they believe violates copyright laws.

82. Universal has routinely made what are called strikes against the Plaintiff's Youtube channel for the same type of content that other Youtube creators routinely post.

83. SME is one of the world's largest music entertainment companies. Both directly and through its affiliated companies and record labels SME produces, manufactures, distributes, markets, sells and licenses some of the most iconic and popular sound records of all al time, as well as many of today's biggest hits. SME also monitors the internet for content posted from their artists which they believe violates copyright laws.

84. SME has routinely made what are called strikes against the Plaintiff's Youtube channel for the same type of content that other YouTube creators routinely post.

85. THE ORCHARD MUSIC, YT ROCKET, INGROVEES, ODMEDIA NETWORK and VIOLENT MUSIC BV have routinely made what are called strikes against the Plaintiff's YouTube channel for the same type of content that other YouTube creators routinely post.

86. These strikes are based on allegations that the content that the Plaintiff has posted somehow violates copyright laws.

87. These strikes are false and in reality, nothing that was posted on the Plaintiff's Youtube channel falls outside of the "Fair Use" doctrine of the copyright laws.

88. The strikes are sent under the Digital Millennium Copyright Act as what is called a DMCA takedown and these DMCA takedowns are sent and an individual such as the Plaintiff is not able to effectively defend against these and ultimately can face action, such as his Youtube channel being removed.

89. As a result of the operation of his business, Plaintiff has a business relationship with the Defendants.

90. The actions of Defendants as previously described constitute a knowing intentional and unjustified interference with his business relationships.

91. As a proximate cause and result of the unlawful actions of Defendants, Plaintiff has suffered damages, including loss of income, loss of profits, and loss of business good will and business relationships.

92. Plaintiff has employed counsel to represent him in this litigation and has agreed to pay counsel a reasonable fee for any and all such services.

93. Plaintiff is entitled to attorney's fees from Defendants.

**WHEREFORE**, Plaintiff, Mr. Mishiyev demands judgment against the Defendants for compensatory damages and an award of reasonable attorneys' fees and costs and further relief as the Court may deem just and proper.

## COUNT III – ALL DEFENDANTS

## (VIOLATIONS OF FLORIDA'S UNFAIR AND DECEPTIVE TRADE PRACTICES ACT, CHAPTER 501, PART II, FLORIDA STATUTES)

94. Plaintiff sets forth the following facts in support of this cause of action.

95. This action arises out of a series of fraudulent Digital Millennium Copyright Act ("DMCA") takedown notices provided to You Tube by the Defendants.

96. As discussed herein, the Defendants were able to do this because of a hole in YouTubes's DMCA process security, which allows any person to claim to be representing any rights holder in the world for purposes of issuing a DMCA takedown.

97. As far as You Tube is concerned, any person, anywhere in the world, can issue a takedown notice on behalf of any rights holder, anywhere.  This could be done by a competitive content producer.

98. The Plaintiff was one of the most highly successful music DJ's in the hip-hop industry and operated a YouTube channel that as of 2018 had over 250,00 subscribers.  The Plaintiff was known as "DJ Short-E". YouTube is a video-sharing site where close to a billion internet users post videos.  Plaintiff spent 10 years building up his YouTube channel. Users can monetize their channels, while making a good living from Google's AdSense program which places advertisements on users videos and channels. The more views the more money you make.

99. YouTube channels operate much like television channels, with each individual channel, being able to develop its own content, interact with users and seek out and gain subscribers, who are then notified each time that channel creates new videos.

100. The Plaintiff was one of the early users of YouTube, having created several YouTube channels, as early as 2007.

101. In 2007, YouTube was still a very new platform.  It has since that time become extremely popular.

102. The number of subscribers that a YouTube channel has is a highly sought after goal and in the early part of 2017 the Plaintiff received a congratulatory letter from the then CEO of YouTube, commemorating his channel reaching 100,000 subscribers and stating, "No one can take this away from you".

103. Tens of thousands of YouTubers posted and continue to post content similar to the Plaintiff and it was only after the content that was posted appeared to be of a politically conservative nature, that the Plaintiff was censored, shadow banned and bombarded with copyright infringement complaints, views to his page were diverted and his channel was ultimately terminated.  For no reason, on or about December 14, 2018 YouTube notified Plaintiff that they were permanently canceling his YouTube channels because of his litigation threat with respect to the issues he has been having with his channels. This left the Plaintiff, a self-employed, life-long Democrat, with no livelihood.

104.    At the time that the Plaintiff's YouTube channel was canceled, he had accumulated over 100 million views and earned over $310,000 from YouTube. Due to the actions of the Defendant/Appellee, the Plaintiff lost his income, his reputation was defamed, his credit score was ruined, and he was placed on the verge of bankruptcy. Adding insult to injury, YouTube now allows other YouTubers to go by the name "DJ Short-E", even though the Plaintiff has a federal trademark for the name "DJ Short-E", with U.S. Serial Number: 85930668, U.S. Registration Number: 4493986, U.S. Registration Date: Mar 11, 2014, Mark: DJ SHORTE, Owner: Mishiyev, Erik--

105.    Plaintiff has never been sued for copyright and never lost a copyright dispute. YouTube did not follow their own terms and conditions and copyright policies and for the first time ever didn't send Plaintiff's counter notifications to claimants so he could defend himself against these frivolous claims, this all started happening the day after they notified Plaintiff that they were taking down his channels, which seemed to be a retaliation of some sort to his litigation threat. It is known that people put frivolous copyright claims on popular videos to try and steal ad earnings and to stifle competition and to stop any momentum the video has by taking it down which causes a Youtuber to get a strike on their channel. After three strikes the channel gets taken down. YouTube allows users to file a dispute and if no court action is taken the videos must go back online and the strike should then be removed. Plaintiff argues that any copyright issues that arose were covered by the Fair Use doctrine.

106.    Plaintiff noticed illegal activity by YouTube when his subscribers contacted him to tell him what was happening to them.

107.    After years of trying to get problems with his channels fixed, Plaintiff threatened YouTube with a lawsuit after their google chat reps were hiding some crucial information from him such as proof of if they were actually sending his new video uploads to his subscribers who wanted to be notified. YouTube said, "We can't share this information with you."

108.    Constant contact and GoDaddy email marketing and countless other companies show full transparency on distribution on the back end, but YouTube does not!

109.    In censoring (flagging, demonetizing, etc.) Plaintiff, Defendants relied upon and acted pursuant to Section 230 of the Communications Decency Act.

110.    Defendants would not have deplatformed Plaintiff or similarly situated Putative Class Members but for the immunity purportedly offered by Section 230.

111.    . Section 230(c)(2) purports to immunize social media companies from liability for action taken by them to block, restrict, or refuse to carry "objectionable" speech even if that speech is "constitutionally protected." 47 U.S.C. § 230(c)(2).

112.    In addition, Section 230(c)(1) also has been interpreted as furnishing an additional immunity to social media companies for action taken by them to block, restrict, or refuse to carry constitutionally protected speech.

113.     Section 230(c)(1) and 230(c)(2) were deliberately enacted by Congress to induce, encourage, and promote social medial companies to accomplish an objective—the censorship of supposedly "objectionable" but constitutionally protected speech on the Internet—that Congress could not constitutionally accomplish itself.

114.     Congress cannot lawfully induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 US 455, 465 (1973).

115.     Section 230(c)(2) is therefore unconstitutional on its face, and Section 230(c)(1) is likewise unconstitutional insofar as it has been interpreted to immunize social media companies for action they take to censor constitutionally protected speech.

116.     Section 230(c)(2) on its face, as well as Section 230(c)(1) when interpreted as described above, are also subject to heightened First Amendment scrutiny as content- and viewpoint-based regulations authorizing and encouraging large social media companies to censor constitutionally protected speech on the basis of its supposedly objectionable content and viewpoint. *See Denver Area Educational Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727 (1996).

117.     Such heightened scrutiny cannot be satisfied here because Section 230 is not narrowly tailored, but rather a blank check issued to private companies holding unprecedented power over the content of public discourse to censor constitutionally protected speech with impunity, resulting in a grave threat to the freedom of expression and to democracy itself; because the word "objectionable" in Section 230 is so ill-defined, vague and capacious that it results in systematic viewpoint-based censorship of political speech, rather than merely the protection of children from obscene or sexually explicit speech as was its original intent; because Section 230 purports to immunize social media companies for censoring speech on the basis of viewpoint, not merely content; because Section 230 has turned a handful of private behemoth companies into "ministries of truth" and into the arbiters of what information and viewpoints can and cannot be uttered or heard by hundreds of millions of Americans; and because the legitimate interests behind Section 230 could have been served through far less speech-restrictive measures.

118.     Universal is the largest record label in the world. In Universal's standardized recording contract, artists assign the copyright in their sound recordings to Universal in exchange for royalty payments. Universal then markets and distributes these recordings and is contractually required to account to its artists for royalties owed. Universal also monitors the internet for content posted from their artist which they believe violates copyright laws.

119.     Universal has routinely made what are called strikes against the Plaintiff's Youtube channel for the same type of content that other YouTube creators routinely post.

120.     SME is one of the world's largest music entertainment companies. Both directly and through its affiliated companies and record labels SME produces, manufactures, distributes, markets, sells and licenses some of the most iconic and popular sound records

of all al time, as well as many of today's biggest hits. SME also monitors the internet for content posted from their artists which they believe violates copyright laws.

121.　　SME has routinely made what are called strikes against the Plaintiff's Youtube channel for the same type of content that other Youtube creators routinely post.

122.　　THE ORCHARD MUSIC, YT ROCKET, INGROVEES, ODMEDIA NETWORK and VIOLENT MUSIC BV have routinely made what are called strikes against the Plaintiff's Youtube channel for the same type of content that other Youtube creators routinely post.

123.　　These strikes are based on allegations that the content that the Plaintiff has posted somehow violates copyright laws.

124.　　These strikes are false and in reality nothing that was posted on the Plaintiff's Youtube channel falls outside of the "Fair Use" doctrine of the copyright laws.

125.　　The strikes are sent under the Digital Millennium Copyright Act as what is called a DMCA takedown and these DMCA takedowns are sent and an individual such as the Plaintiff is not able to effectively defend against these and ultimately can face action, such as his Youtube channel being removed.

126.　　Pursuant to § 501.204 (1), Florida Statutes, "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful"

127.　　As set forth in the above paragraphs, Defendants have engaged in a pattern of misinformation, deception and unconscionable acts and practices, and unfair and deceptive acts and practices in the conduct of trade and commerce with regards to the lease agreement and the failure to make repairs to the Property.

128.　　Pursuant to § 501.211 (1), Florida Statutes,　"Without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part."

129.　　Furthermore, pursuant to § 501.211 (2), Florida Statutes, "In any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs as provided in s. 501.2105."

130.　　Defendants have willfully engaged in the acts and practices as outlined in the above paragraphs, when they knew or should have known that such acts and practices were unfair and deceptive or otherwise prohibited by law.

131.　　These above-described acts and practices of the Defendants have injured and will likely continue to injure and prejudice the Plaintiff.

132.　　Unless the Defendants are temporarily and permanently enjoined from engaging further in the acts and practices complained of herein, the Defendant's actions will result in irreparable injury to the Plaintiff for which there is no adequate remedy at law.

133.     As a direct and proximate result of Defendant's unfair and deceptive practices, Plaintiffs have incurred damages substantially in excess of $30,000.00, which include, *inter alia*, direct and consequential damages, extra expenses, loss of profits, attorney's fees and damages.

**WHEREFORE**, Plaintiff, Mr. Mishiyev demands judgment against the Defendants for compensatory damages and an award of reasonable attorneys' fees and costs and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues within this Complaint.


RESPECTFULLY SUBMITTED on this <u>26th</u> day of October, 2023.


By: _____

Plaintiff, ERIK MISHIYEV

**COMPOSITE EXHIBIT "A"**

 Gmail

**DJ Short-e <djshortehot4eva@gmail.com>**

## Copyright Strikes Video Ids

**YouTube Copyright** <youtube-disputes+0ngb10ki0vg8f0q@google.com>          Tue, Jul 4, 2023 at 5:50 AM
Reply-To: YouTube Copyright <youtube-disputes+0ngb10ki0vg8f0q@google.com>
To: djshortehot4eva@gmail.com

Hello,

Attached is the information regarding your copyright claims. You may reach out to the content owners at the emails listed.

| Video Id | Claimant Name | Claimant Email |
|---|---|---|
| [onlRQn0zCW8] | [The Orchard Music] | disputes@theorchard.com |
| [9Lb01gKxTzQ] | [YT Rocket] | showsnickyjam@gmail.com |
| [K5y-8-bU8p8] | [INgrooves] | youtubeclaimsdisputes@ingrooves.com |
| [dSKxm6Bk8Fl] | [INgrooves] | youtubeclaimsdisputes@ingrooves.com |
| [z5bxml59DV4] | [ODMedia Network] | copyright@odmedia.nl |
| [1nBmVV6U6DY] | [UMG] | peeleremi@gmail.com |
| [ngLzAoSfdP4] | [UMG] | peeleremi@gmail.com |
| [kDJZZCXQPR0] | [UMG] | peeleremi@gmail.com |
| [Purged] | [Violent Music BV] | hans@violent.eu |

Sincerely,
The YouTube Team

On July 4, 2023 djshortehot4eva@gmail.com wrote:

[Quoted text hidden]





≡  YouTube Help          🔍 Describe your issue

owner sent us a complete and valid legal request asking us to do so. When a copyright owner formally notifies us that you don't have their permission to post their content on the site, we take down your upload to comply with copyright law.

Keep in mind that videos can be removed from the site for different reasons, not all of which are copyright-related. Also, Content ID claims don't result in a strike.

⚠ Deleting a video with a strike won't resolve your strike. Click below to see how to resolve a copyright strike.

What happens when you get a copyright strike                                    ⌄

How to get information about your strike                                         ⌄

How to resolve a copyright strike                                                ⌃

There are three ways to resolve a copyright strike

1. Wait for it to expire: Copyright strikes expire after 90 days, as long as you complete Copyright School ⤢

2. Get a retraction: You can contact the person who claimed your video and ask them to retract their claim of copyright infringement.

3. Submit a counter notification: If your video was mistakenly removed because it was misidentified as infringing, or qualifies as a potential fair use, you may wish to submit a counter notification.

Hangouts On Air

📄  Dispute a Content ID claim

📄  Remove claimed songs from videos

📄  Swap the audio track on your video

📄  Counter Notification Basics

📄  Monetization during Content ID disputes

📄  What is a scheduled copyright takedown request?







copyright@youtube.com
to me ▾

Mon, Sep 24, 7:02 PM

Hello,

Please disregard the previous message and thank you for your counter notification. It has been forwarded to the party that sent the takedown notification.

...

Keep in mind that by submitting this counter notification, you've initiated a formal legal dispute process. As such, YouTube will handle this process in accordance with the law. This process takes some time, so we kindly ask for your patience.

Upon forwarding your counter notification to the claimant, we will allow them 10 - 14 business days from this date to respond with evidence that they have taken court action against you to prevent the reinstatement of the video(s) in question.

If we receive no response, after that time period your videos will be restored and the associated penalties on your account will be resolved.

You will receive updates in this email thread about your counter notification's status. You can also check its status within your Video Manager.

Regards,

The YouTube Legal Support Team



**Plaintiff Erik Mishiyev AKA DJ Short-E**